1  Richard A. Tamor, Esq.
   TAMOR & TAMOR
2  1901 Harrison St., 9th Floor
   Oakland, CA 94612
3  Tel. (510) 874-4170
   Fax (510) 874-4174
4  web: www.TamorLaw.com

   Attorneys for Defendant,
5  Michael Northcutt

6

7

8

9                        UNITED STATES DISTRICT COURT

10                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12  UNITED STATES OF AMERICA,        )   Case No. CR-07-00669 SI
                                     )
13                  Plaintiff,       )
                                     )
14      vs.                          )   NOTICE OF MOTION AND MOTION
                                     )   TO SUPPRESS EVIDENCE;
                                     )   MEMORANDUM OF POINTS AND
15                                   )   AUTHORITIES IN SUPPORT
    MICHAEL NORTHCUTT,               )   THEREOF
16                                   )
                    Defendant.       )
17                                   )   Date: May 23, 2008
                                     )   Time: 11:00 a.m.
                                     )   Court: Hon. Susan Illston
18                                   )
                                     )
19  _____)

20  TO:    JOSEPH RUSSONIELLO, UNITED STATES ATTORNEY; ANDREW CAPUTO.
           ASSISTANT UNITED STATES ATTORNEY
21
         PLEASE TAKE NOTICE that on May 23, 2008, at 11:00 a.m., or as soon thereafter as
22
    the matter may be heard in the above-entitled court, defendant Michael Northcutt, by and
23
    through his counsel, will move the court for an order that the evidence described below and any
24
    fruits thereof be suppressed on the grounds that it was obtained as a result of an illegal search
25
    and/or seizure in violation of the defendant's rights under the Fourth Amendment to the United
26

27

States Constitution.

The evidence to be suppressed consists of a black semiautomatic handgun; photographs and/or videotape; statements and observations of officers, witnesses and defendant; any other tangible and intangible evidence obtained and all fruits deriving therefrom as the result of the following illegal act(s):

The unlawful detention of Mr. Northcutt and the warrantless search of his vehicle.

Mr. Northcutt asserts a reasonable expectation of privacy in the area searched and/or the items seized, and is prepared to prove the same at the hearing on the motion.

These motions are based upon this Notice, the attached Memorandum of Points and Authorities and exhibits, the files and records of this case, and any evidence, argument or authorities to be presented at the hearing on the motions.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Defendant Michael Northcutt requests that this court suppress evidence constituting the fruits of an illegal search and seizure. The Government has not produced evidence that the officers were justified in relying on an informants tip. Further, even if the initial stop was justified, the officers acted beyond the scope of an investigatory stop and acted unreasonably in searching Mr. Northcutt's vehicle.

### II. STATEMENT OF FACTS

According to San Francisco Police Department Incident Report number 070754986 (Exh. "A"), on July 26, 2007, at 11:13 a.m., San Francisco Police Officers Laval (#4016) and Kim (#976) received information from their Communications Division that "a black male adult was driving a white Ford Taurus station wagon in the area of Market St. and Taylor St."

Communications described the vehicle as having tinted windows with a license plate ending in either "R301" or "R103." Further the black male was described as having a "Desert Eagle" .50 caliber handgun on his lap.

At 11:48 a.m., while driving north on Sixth Street at Market, the officers saw a white Ford Taurus stopped for a red light northbound on Market at Taylor. Though the Taurus had tinted windows, they could see that a Black man was driving. The car's license plate ended in R301. Officers Laval and Kim effected a "felony stop." As the two officers exited their vehicles, Officer Meehan (#109) pulled his vehicle alongside, and with their machine guns drawn, ordered the driver, Michael Northcutt, out of the vehicle. He complied with their orders and laid prone on the ground.

The officers did a "protective sweep" of the vehicle "for any outstanding suspects." "Due to the dark tint covering the windows," the officers "had to open each door and the lift gate to 'clear' the vehicle." While doing so, they noticed the barrel tip of a black handgun protruding from underneath the right front passenger seat.

They arrested Mr. Northcutt, took photos, and seized the gun, a Baretta.

The officers later learned that the source of information was San Francisco Police Officer Nocetti (#394), who in turn obtained the information from a "confidential reliable informant" ("CRI"). The CRI told Officer Nocetti that "they observed a black male in possession of a firearm while he was driving in the 6th/Market St. Area." The CRI further stated that "the vehicle, which the black male was the driver and sole occupant," was a white Ford Taurus with a partial plate ending with "R301." Finally, the vehicle was northbound on Taylor St. toward Turk St. within the past several minutes, and that the firearm was similar to a "Desert Eagle."

## II. DISCUSSION

Law enforcement officers have the liberty, in common with other citizens, "to address questions to other persons, for ordinarily the person addressed has an equal right to ignore his interrogator and walk away." *Terry v. Ohio*, 392 U.S. 1, 32033 (1968).  Such an interrogation turns into a seizure under the Fourth Amendment when, "taking into account all the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business" or that he "was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 437 (1991); *Dunaway v. New York*, 442 U.S. 200 (1980)("It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has seized' that person.").  When a search and seizure occurs without a warrant, the government must provide the existence of an exception to the Fourth Amendment Warrant Requirement by a preponderance of the evidence. *United States v. Jeffers*, 342 .S. 48 (1951); *See United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1295 (9th Cir. 1988)(it is the government's burden to show that a warrantless search does not violate the Fourth Amendment).

A defendant may challenge the propriety of a search or seizure that violates the defendant's reasonable expectations of privacy in the area searched or the item seized. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978); *Minnesota v. Carter*, 525 U.S. 83, 88-89 (1998).  The bailee of a vehicle has a legitimate expectation of privacy in the contents of the car. *United States v. Portillo* 633 F.2d 1313 (9th Cir. 1980).  As the driver, Mr. Northcutt had a legitimate expectation of privacy in the car.

In this case, the "felony stop," with the officers' rifles drawn, establishes that a seizure

−4−

Notice of Motion, Motion and Memorandum of Points and Authorities in Support of Motion to Suppress
United States v. Northcutt CR-07-00669 SI

has occurred, implicating the Fourth Amendment. Accordingly, the government must establish an exception to the warrant requirement. However, the government cannot do so because (1) the officers did not have a reasonable, articulable suspicion that Mr. Northcutt was, is, or about to be involved in criminal activity; (2) the scope of Mr. Northcutt's detention was unreasonable; and (3) the officers did not have reasonable grounds to search the vehicle. Thus, this court should suppress the evidence.

### A. THE GOVERNMENT CANNOT ESTABLISH THAT THERE WAS FOUNDED SUSPICION OF CRIMINAL CONDUCT TO JUSTIFY THE STOP

That a brief investigatory stop does not violate the Fourth Amendment was first introduced in *Terry, supra*, and the level of cause necessary to provide a sufficient basis for a brief investigatory stop was first defined in *United States v. Cortez*, 449 U.S. 411 (1981). "An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *Cortez*, 449 U.S. at 417. In evaluating the lawfulness of the stop, the "totality of the circumstances – the whole picture – must be taken into account. Based upon that whole picture the detaining officers must have *a particularized and objective basis* for suspecting the particular person stopped of criminal activity." *Id*. at 417-18. Founded suspicion must exist at the time the officer initiates the stop. *United States v. Fouche*, 776 F.2d 1398, 1402 (9th Cir. 1985).

To meet this standard, the officer must point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Terry*, 392 U.S. at 21. Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. *Alabama v. White*, 496 U.S. 325, 330 (1990). In the case of a police radio dispatch, the dispatcher must possess reasonable suspicion before directing the officer to make a stop. *United States v. Hensley*, 469

–5–

U.S. 221, 232 (1985); *United States v. Robinson*, 536 F.2d 1298, 1300 (9th Cir. 1976).

Courts will uphold an investigatory stop based on a tip or other secondary information only when the information possesses sufficient indicia of reliability **that are independently corroborated by the police**. *United States v. Thomas*, 211 F.3d 1186, 1190 (9th Cir. 2000)(officer unreasonably relied on factually devoid information from FBI agents). If an officer relies on information from another, that information must itself be based on reasonable suspicion. *Id*. at 1189. The officer cannot simply defer to the other's suspicion without establishing the articulable facts on which that suspicion is based. *Id*. Thus, while the officer affecting the stop need not have personal knowledge of the facts constituting reasonable suspicion, such evidence must be produced when challenged:

> The fact that an officer does not have to have personal knowledge of the evidence supplying good cause for a stop before he can obey a directive to detain a person or a vehicle does not mean that the Government need not produce evidence at trial showing good cause to legitimate the detention when the legality of the stop is challenged. If the dispatcher himself had had founded suspicion, or if he had relied on information from a reliable informant **who supplied him with adequate facts to establish founded suspicion**, the dispatcher could properly have delegated the stopping function to [another officer]. But if the dispatcher did not have such cause, he could not create justification simply by relaying a directive to a fellow officer to make the stop.

*Robinson*, 536 F.2d at 1300 (emphasis added)

In *Florida v. J.L.*, 529 U.S. 266 (2000), the Supreme Court spoke conclusively that information from an untested informant, which information is merely descriptive, not predictive, cannot support reasonable suspicion. In that case, an informant's tip that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun, was insufficient to justify a *Terry* stop:

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip,

> however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.

*J.L.*, 529 U.S. at 272. Because the police did not see any criminal activity that corroborated the informant's knowledge, the evidence in *J.L.* was suppressed. *Id*.

In the present case, Officer Nocetti gave the directive to stop Mr. Northcutt. His directive was based solely on information provided by a "CRI," based on the CRI's observations. (Exh. "A") Apart from this tip, none of the officers, including Officer Nocetti, had reason to suspect Mr. Northcutt of illegal conduct. Moreover, the information provided by the CRI was merely descriptive of the subject's readily observable location and appearance, and contained no facts sufficient to establish reasonable suspicion. It contained no predictive information and left the officers without a means to test the informant's knowledge or credibility. "That the allegation about the gun turned out to be correct does not suggest that the officers, prior to the [stop], had a reasonable basis for suspecting [defendant] of engaging in unlawful conduct," since "[t]he reasonableness of official suspicion must be measured by what the officers knew before they conducted their search." *Id*. at 271.

In contrast, in *Warden v. Williams*, 407 U.S. 143, 146-47 (1972), the Supreme Court found the intrusion justified. In that case, the officer was alone, early in the morning, on car patrol in a high-crime area. The informant approached his cruiser and told him that an individual seated in a nearby vehicle was carrying narcotics and had a gun at his waist. Investigating the information, the officer tapped on the window of the nearby car and asked the occupant to open the door. Instead, the occupant rolled down the window, whereupon the officer reached into the car and removed a fully loaded revolver from the occupant's waist. The gun had not been visible to the officer from outside the car, but was in precisely the place

−7−

indicated by the informant. *Id*. at 144-145.  In holding the intrusion justified, the Supreme Court found that the officer reasonably relied on informant because the informant was known to him personally, had provided information in the past, and informant came forward personally to give information that was immediately verifiable at the scene. *Id*. at 146.

     The present case is distinguishable from *Williams*.  In this case, the Incident Report provides no information establishing that Officer Nocetti reasonably relied on the CRI.  All he states in the report is that he "was contacted by a Confidential Reliable Informant." Other than characterizing the informant as "reliable," Officer Norcetti gives no further information about the informant.  We do not know who the informant is, or when, where, or how this informant knew of the information.  We do not know if this informant has provided reliable information in the past, or if credibility issues surround him.  Unlike *Williams*, the officers in this case were not provided information that was "immediately verifiable at the scene," and the officers could not, and did not, independently corroborate the statement's reliability prior to the stop and search.  Unlike the officer in *Williams*, the officers in this case were directed to the suspect's location, chased Mr. Northcutt down, effected a "felony stop," and with their machine guns drawn, ordered him prone to the ground.  Unlike *Williams,* where the gun was found in the precise place indicated by the informant, the officers in this case went beyond the information provided by the CRI, ignored the CRI's statement that the driver was the sole occupant of the car, and conducted a "'protective sweep' of the vehicle for any outstanding suspects." (Exh. "A"). They had to open each door and liftgate to "clear" the vehicle, and it was during this "protective sweep" for outstanding suspects that the officers discovered the gun.

     Based on the foregoing, the evidence provided by the government fails to establish that Officer Nocetti or the responding officers had reasonable suspicion that Mr. Northcutt was

-8-

committing a crime.

**B.    EVEN IF THE INITIAL STOP WAS JUSTIFIED, THE GOVERNMENT CANNOT ESTABLISH THAT THE SUBSEQUENT DETENTION WAS JUSTIFIED**

A *Terry* stop is, by its very nature, of a temporary duration and limited in its intrusiveness on the liberty of the suspect being investigated. *United States v. Thomas*, 863 F.2d 622, 628 (9th Cir. 1988). Investigatory stops that initially comply with the Fourth Amendment because they are supported by reasonable suspicion may violate the Fourth Amendment if they continue for a period of time beyond that which is necessary for brief investigation. *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486 (9th Cir. 1996). *Terry* stops are "constitutionally permissible only where the means utilized are the least intrusive reasonably available. '[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.'" *Kraus v. County of Pierce*, 793 F.2d 1105, 1108 (9th Cir. 1986)(quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)).

In assessing the effect of the length of the detention, courts take into account whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain defendant. *Royer*, 460 U.S. at 500; *See, United States v. Chamberlin,* 644 F.2d 1262, 1267 (9th Cir. 1980)(holding suspect for 20 minutes to search for other suspect exceeded *Terry* stop). The amount of force used by the police may contribute to a finding that an arrest occurred. *United States v. Al-Azzawy*, 784 F.2d 890 (9th Cir. 1985) (arrest occurred at time that officers surrounded trailer with weapons drawn); *United States v. Robertson*, 833 F.2d 777 (9th Cir. 1987) (detention of suspect at gunpoint by at least seven officers was an arrest). A detention that has ripened into an arrest requires probable cause at the moment the arrest is made. *Michigan v. Summers*, 452 U.S. 692,

-9-

700 (1981).

In the present case, the officers' detention of Mr. Northcutt, with their machine guns drawn and ordering him prone to the ground, and their subsequent search of his vehicle, went beyond any attempt to investigate the CRI's claims. It amounted to an arrest, requiring probable cause.

### C. EVEN IF THE DETENTION DID NOT AMOUNT TO AN ARREST, THE SEARCH OF THE CAR VIOLATED THE FOURTH AMENDMENT

Officers making a traffic stop may search the passenger area of a vehicle if, under the totality of circumstances, they have reasonable suspicion to believe the suspect is dangerous and may gain immediate control of a weapon. *Michigan v. Long*, 463 U.S. 1032, 1049 (1983). However, the high court "stress[ed] that our decision does not mean that the police may conduct automobile searches whenever they conduct an investigative stop." A *Terry* search, "unlike a search without a warrant incident to a lawful arrest, is not justified by any need to prevent the disappearance or destruction of evidence of crime...The sole justification of the search...is the protection of the police officer and others nearby...." *Id*. at 1049-1050, n.14. Protective searches, then, are "limited to those areas in which a weapon may be placed or hidden,...if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Id*. At 1049. Permissible areas are those surrounding the suspect, including the passenger compartment of the automobile. *Id*.

While the government may argue that the search of the automobile was warranted given the possible danger to the officers, the search conducted by the officers was **not** a protective search but was a search for evidence of a crime, i.e., possession of a gun. Their search was not

-10-

limited to the permissible areas of a protective search, but **they searched the entire car, opening all doors and the liftgate**, obviously in search of the evidence and ultimately finding it underneath the right front passenger seat.  That the gun was ultimately found in an area permitted by a protective search does not in any way validate the search for evidence, which went beyond that permitted by a *Terry* stop.

Moreover, the officers themselves acknowledge that they were not conducting a protective search for weapons, but "a 'protective sweep' of the vehicle for any outstanding suspects." (Exh. "A").  But the officers did not have, nor could they have, a reasonable belief based on specific and articulable facts, that a "protective sweep" was warranted.  **The CRI specifically stated that the driver was the sole occupant of the car**.  The reasonable suspicion that authorized the stop depended entirely on the statements of the CRI to Officer Nocetti.  As the court in *Robinson, supra,* stated, if Officer Nocetti "had relied on information from a reliable informant who supplied him with adequate facts to establish founded suspicion, [he] could properly have delegated the stopping function to [another officer]. But if [he] did not have such cause, he could not create justification simply by relaying a directive to a fellow officer to make the stop." *Robinson*, 536 F.2d at 1300.  Based on the information given by the CRI that the driver was the sole occupant of the car, Officer Nocetti would not have been justified to conduct a "protective sweep."  Neither were the responding officers, and justification for the "protective sweep" could not have been created simply because Officer Nocetti directed others to make the stop.

Indeed, the "protective sweep" was a mere pretext to conduct an impermissible search for evidence.  The officers claim in the report that they had to open each of the car doors and the lift gate "due to the dark tint covering the windows." (Exh. "A").  However, before the stop,

-11-

1  they were able to see, across several lanes of traffic, sufficient details of Mr. Northcutt's face

2  and body to determine that he was a Black man. (Exh. "A").  If they could tell that from a

3  distance, they could surely tell that there were no other occupants.  There was no need to open

4  the doors.

5      Since the detention was unlawful, the gun and all that flowed from it must be

6  suppressed.  Evidence seized as the result of a search and seizure that have exceeded

7  permissible bounds is the "fruit of the poisonous tree" and must be excluded. *Wong Sun v.*

8  *United States*, 371 U.S. 471 (1973).  All evidence seized after the illegal act, including physical

9  evidence, all observations of officers and other witnesses, and all evidence derived therefrom

10  must be excluded.

### III. CONCLUSION

Based on the foregoing, Mr. Northcutt respectfully requests that this court suppress all the fruits of the illegal search.

Dated: April 25, 2008

    Respectfully Submitted,
    TAMOR & TAMOR


_____/s/_____
Richard A. Tamor, Esq.
Attorneys for Defendant,
Michael Northcutt

# EXHIBIT A

# San Francisco Police Department
# INCIDENT REPORT

**Report Type:** Initial

**Incident Number:** 070754986

| | |
|---|---|
| Incident Number | 070-754-986 |
| Occurrence from Date/Time | 07/26/07 11:13 |
| Occurrence to Date/Time | 07/26/07 11:13 |
| Reported Date/Time | |
| CAD Number | 072071401 |

**Type of Incident:** Firearm, Possession of Loaded -12100, Firearm, Loaded, in Vehicle, Possession or Use -12168, Firearm, Possession By Prohibited Person -12080

**Location of Occurrence:** Market Street
**At Intersection with/Premise type:** Taylor Street Street, (Not Sidewalk)

| Confidential Report? | Arrest Made? ☑ | Suspect Known? | Suspect Unknown? | Non-Suspect Incident? | Domestic Violence? | (Type of Weapon Used) | Reporting Unit 4T1E |
|---|---|---|---|---|---|---|---|

**Location Sent:** On view

| How Cleared? | Reported to Bureau | Name | Star | Date/ | Time | Elder Victim | Gang Related? ☑ | Juvenile Subject? | Prejudice Based? |
|---|---|---|---|---|---|---|---|---|---|
| 6 | Crime Scene Invest. | Gee | 574 | 07/26/07 | 12:40 | | | | |

## OFFICER DECLARATION

I declare under penalty of perjury, this report of _7_ pages is true and correct, based on my personal knowledge, or is based on information and belief following an investigation of the events and parties involved.

**PROP 115 CERTIFIED  5 YEAR/POST**  Signature: _[signature]_

| | | Star | Station | Watch | Date |
|---|---|---|---|---|---|
| Reporting Officer | MARK H. MADSEN | 1166 | Crime Prevention Co. | 0700-1700 | |
| Reviewing Sgt. Glenn Mar # 1829 CPC / Tactical Unit | | | Crime Prevention Co. | 0700-1700 | |
| OIC | Sgt. Glenn Mar # 1829 CPC / Tactical Unit | | Tactical Co. | 0700-1700 | 07/26/07 |

**Related Case:** Assigned to: Assigned to 5G200  Assigned by 1829
**Copies to:** 5G200  5G200  5G200  Add'l Copies TTF, DA2

## REPORTEE

| Code | Name (Last, First Middle) | Alias |
|---|---|---|
| R | SFPD #394, | |

| Day Phone | Type | Home Address | City | State | Zip Code |
|---|---|---|---|---|---|
| (415) 345-7300 | | | | | |

| Night Phone | Type | Work Address | City | State | Zip Code |
|---|---|---|---|---|---|
| | | Tenderloin Police Station | | | |

| DOB / Age | DOB Unk. | or age between: and | Race | Sex | Height | Weight | Hair Color | Eye Color | ID Type | Jurisd. | ID No. |
|---|---|---|---|---|---|---|---|---|---|---|---|

| Confidential Person | Violent Crime Notification | 293 PC Notification | Star | Follow-up Form YES | Statement YES | Relationship to Subject |
|---|---|---|---|---|---|---|

**School (if Juvenile):** **Injury/Treatment:** **Other Information/If Interpreter Needed Specify Language:**

## BOOKED 1

| Code | Name (Last, First Middle) | ALIAS |
|---|---|---|
| B 1 | Northcutt, Michael D. | |

| Day Phone | Type | Home Address | City | State | Zip Code |
|---|---|---|---|---|---|
| | | 639 Central | San Francisco | CA | |

| Night Phone | Type | Work Address | City | State | Zip Code |
|---|---|---|---|---|---|

| DOB Unknown | Date of Birth 10/15/80 | Age 26 | or age between and | Race B | Sex M | Height 6'03 | Weight 200 | Hair Color BLK | Eye Color BRO |
|---|---|---|---|---|---|---|---|---|---|

| SFNO | J/D# (if Juv.) | ID Type/Jurisdiction/Number | ID Type/Jurisdiction/Number | ID Type/Jurisdiction/Number |
|---|---|---|---|---|
| 544748 | | DL CA D1388448 | | |

| Book Section #1 | Book Section #2 | Book Section #3 | Book Section #4 | Book Section #5 | Booking Location |
|---|---|---|---|---|---|
| N/W 12021a.1PC | N/W 12025b.1PC | N/W 12025b.6PC | 12031a.1PC | 186.22 PC | Tenderloin Station |

| Warrant # | Court # | Action # | Dept | Enroute to | CWB Check Lena | Star 56 |
|---|---|---|---|---|---|---|

| Warrant Violation(s) | | | Bail | Mirandized ☑ | Star | Date/Time 07/26/07 | Statement ☑ |
|---|---|---|---|---|---|---|---|

| Citation # | Violation(s) | | | Appear Date/Time | Location of Appearance |
|---|---|---|---|---|---|

| Book/Cite Approval Sgt. Mar | Star 1829 | Mass Arrest Code | M X-Rays ☐ | School (if Juvenile) | ☐ CA Form Booked Copy Attached |
|---|---|---|---|---|---|

**Other Information:** Citation/Warrant/Booking Charge(s)/Missing Person-Subject Description; Scars, Marks, Tattoos
Wearing white T-shirt, blue jeans, red boots

# 070754986

## San Francisco Police Department
### PROPERTY LISTINGS

| E 1 | Code/No: EVD 1 | Item Description: "Office Depot" 2HD IBM Format 1.44 MB Disks | | | | Brand: Office Depot | Model: |
|---|---|---|---|---|---|---|---|
| | Serial No. | Gun Make | Caliber | Color | Narcotics Lab No. | Quantity: 2 | Value |
| | Seized by (Star) | From Where | | | | | |
| | Additional Description/Identifying Numbers: Disks containing photo's of the firearm taken by CSI from TTF. Beretta 96 .40 Caliber Serial #Ber012773M(E-4) | | | | | | |

| E 2 | Code/No: EVD 2 | Item Description: SFPD Statement form #377G | | | | Brand: | Model: |
|---|---|---|---|---|---|---|---|
| | Serial No. | Gun Make | Caliber | Color | Narcotics Lab No. | Quantity | Value |
| | Seized by (Star) | From Where | | | | | |
| | Additional Description/Identifying Numbers: Written by Off. Meehan #109 | | | | | | |

| E 3 | Code/No: EVD 3 | Item Description: SFPD Statement form #377G | | | | Brand: | Model: |
|---|---|---|---|---|---|---|---|
| | Serial No. | Gun Make | Caliber | Color | Narcotics Lab No. | Quantity | Value |
| | Seized by (Star) | From Where | | | | | |
| | Additional Description/Identifying Numbers: Written by Off. Nocetti #394 | | | | | | |

| E 4 | Code/No: EVD 4 | Item Description: Black semi-auto handgun, loaded | | | | Brand: Beretta | Model: 96 |
|---|---|---|---|---|---|---|---|
| | Serial No.: BER012773M | Gun Make | Caliber: .40 | Color: BLK | Narcotics Lab No. | Quantity | Value |
| | Seized by (Star): 975 | From Where: Underneath the right front passenger seat of vehicle (F) | | | | | |
| | Additional Description/Identifying Numbers: | | | | | | |

| | Code/No | Item Description | | | | Brand | Model |
|---|---|---|---|---|---|---|---|
| | Serial No. | Gun Make | Caliber | Color | Narcotics Lab No. | Quantity | Value |
| | Seized by (Star) | From Where | | | | | |
| | Additional Description/Identifying Numbers | | | | | | |

| | Code/No | Item Description | | | | Brand | Model |
|---|---|---|---|---|---|---|---|
| | Serial No. | Gun Make | Caliber | Color | Narcotics Lab No. | Quantity | Value |
| | Seized by (Star) | From Where | | | | | |
| | Additional Description/Identifying Numbers | | | | | | |

| | Code/No | Item Description | | | | Brand | Model |
|---|---|---|---|---|---|---|---|
| | Serial No. | Gun Make | Caliber | Color | Narcotics Lab No. | Quantity | Value |
| | Seized by (Star) | From Where | | | | | |
| | Additional Description/Identifying Numbers | | | | | | |

# San Francisco Police Department
# VEHICLE INFORMATION

**070754986**

VEHICLE CODES: B -BOOSTED; D -DAMAGED; F -USED FELONY; T -TOWED; U -USED OTHER; V -VANDALIZED; X -STRIPPED

### Vehicle 1

| Code | Plate No. | State | Reg Yr | Plate Type | VIN No. |
|---|---|---|---|---|---|
| F | 5YFR301 | CA | 2008 | PC | 1FAFP57S1WG256583 |

| Veh Year | Make | Model |
|---|---|---|
| 1998 | Ford | Taurus |

| Style | Color | Plates/VIN Match? | Plates Missing? |
|---|---|---|---|
| Station Wagon | White | ☑ | FRONT ☐ REAR ☐ |

Condition (Check all that apply): APPARENTLY DRIVABLE ☑  BURNED? ☐  DAMAGED? ☐  STRIPPED? ☐

Damage: — Point of Entry: —

| Crime Scene Tech. Notified? | 387 Form Given to Owner? | Tow Approved By (Name) | Star | Towed to (Name/Address) | Tow Check (Name) | Star |
|---|---|---|---|---|---|---|
| ☐ | ☐ | Sgt. Mar | 1829 | Auto Return | | |

Hold For: Other (narrative)
Other Information:

**Owner:**
Registered Owner Business Name/Last Name: Evans
First Name: Lakia
Residence Phone:
Residence Address: 958 Ellsworth
City: San Francisco
State: CA
Zip:
Business Phone:

### Vehicle 2

(blank)

### Vehicle 3

(blank)

Incident# 070754986

Page 3 of 7

**070754986**

San Francisco Police Department
**NARRATIVE**

While on directed patrol in the Mission District, Officer Laval #4016, Officer Kim #975 and I were redirected by our Communications Division to the Tenderloin District on a call of a man with a gun. We were in full uniform and in a marked patrol vehicle. Communications advised us that a black male adult was driving a white Ford Taurus station wagon in the area of Market St. and Taylor St. The vehicle had tinted windows and the license plate was described as ending in either "R301" or "R103". The black male was described as having a "Desert Eagle" .50 Caliber handgun on his lap. Due to the high caliber of the handgun, Officer Kim and I retrieved our issued "Colt M-4" machine guns from the trunk of our vehicle and we responded with Officer Laval to the area of Market and Taylor.

After we arrived in the area, we began a systematic search of the surrounding streets. At approximately 1148 hours, we were traveling North on 6th St. at Market St. when we observed a white Ford Taurus stopped at a red light w/b on Market at Taylor St. The Taurus had tinted windows and we could see that a black male was driving the vehicle. Upon closer inspection, we noticed the plate ending in "R301". We believed that this was the vehicle matching the earlier broadcast. I called a "Code-33" (Request to clear the channel). I put out the information to Communications as the vehicle made a right turn onto Taylor St. from Market St. We pulled behind it where Officer Laval turned on our vehicle's emergency lights and siren to effect a "felony stop". The vehicle stopped in front of 25 Taylor. Officer Laval exited our vehicle on the left side, and Officer Kim and I exited the vehicle on the right side. Officer Meehan #109, 3B7A pulled along side of Officer Laval. With our rifles drawn, Officer Laval ordered the suspect out of the vehicle. The suspect, B-1 Northcutt, complied with Officer Laval's orders and was proned out on the ground.

Officer Kim and I moved forward to conduct a "protective sweep" of the vehicle for any outstanding suspects. Due to the dark tint covering the windows, Officer Kim and I had to open each door and the liftgate to "clear" the vehicle. During our "protective sweep" Officer Kim and I noticed what appeared to be a black colored handgun, lying on the floorboard, with the tip of the barrel protruding from underneath the right front passenger seat. We left the handgun there and continued to visually clear the vehicle. There wasn't anyone else in the vehicle. We advised Sgt. Bush 3J101, #545, and Lt. Hofmann 3J202, #2147, who were on scene, of the location of the handgun. Officer Recinos 3J13A, #993, and Sgt. Bush took photo's of the placement of the handgun with department issued cameras, which were captured on floppy disks (E-1).

The driver of the vehicle, B-1 Northcutt, was placed under arrest and transported to Tenderloin Police Station (TTF) by Officer Laubach 3A30, #728. Lt. Hofmann directed me to drive the Taurus back to TTF. We responded to TTF for our follow up investigation. Lt. Hofmann advised me that the reportee that called in the initial information was Officer Nocetti #394. Officer Nocetti received information regarding the vehicle and information from a source detailed in a statement form that Officer Nocetti later completed and booked at TTF.(E-3) Lt. Hofmann also told me that the suspect, Northcutt, was a person of interest to the SFPD Gang Task Force, and that GTF would be responding to TTF to take charge of the investigation. Officer Meehan advised me that Northcutt made a spontaneous statement to him at the scene of the arrest. Officer Meehan memorialized that statement on a statement form that he later completed and was booked by Officer Laval at TTF.

The vehicle, F-1, was inventoried by Officer Kim. Officer Kim, using latex gloves, seized the handgun(E-4), from underneath the right front passenger seat and placed it into a cardboard box. I took the box from Officer Kim and brought it to the Lt.'s office at TTF. I took a photo of the gun with the case number next to it. The photo is on disk#2, which was booked into evidence at TTF(E-1) by Officer Laval. I notified CSI to process the handgun, and Inspector Gee #574 responded to TTF and took custody of the handgun. Officer Laval had earlier checked the handgun on the computer but a

record could not be located. The vehicle, F-1, was towed to Auto Return with a hold for GTF.

Inspector Bosshard #1585, Officer Do #53, and Officer Murray #4032 responded to TTF from the Gang Task Force Unit. They took charge of the investigation and interviewed the suspect, Northcutt. Officer Laval and I reviewed Northcutt's "rap sheet" and noted that he had numerous prior arrests for firearms and narcotics violations. We also noted that he was an ex-felon in possession of a firearm. After their interview with Northcutt, GTF placed an additional charge of 186.22 P.C. with the approval of Sgt. Mar #1829. Northcutt was booked at TTF per the listed charges.

## SAN FRANCISCO POLICE DEPARTMENT — INCIDENT REPORT STATEMENT

| INCIDENT NO. | 07054986 |
|---|---|

| NAME (LAST, FIRST, MIDDLE) OF PERSON GIVING STATEMENT | DOB/AGE | RESIDENCE PHONE (DAY/NIGHT) | BUSINESS PHONE (DAY/NIGHT) |
|---|---|---|---|
| OFFICER ANDREW MEEHAN, #109 | | ( ) | ( ) |

| RESIDENCE ADDRESS / CITY IF NOT SAN FRANCISCO | ZIP CODE | BUSINESS ADDRESS / CITY IF NOT SAN FRANCISCO | ZIP CODE |
|---|---|---|---|
| | | | |

| DATE OF STATEMENT | TIME STARTED | TIME COMPLETED | LOCATION WHERE STATEMENT TAKEN |
|---|---|---|---|
| 7/26/07 | 1230 HRS | 1240 HRS | AT SCENE ☐  OTHER: CO. B. |

| STATEMENT TAKEN BY (NAME / STAR) | IN PRESENCE OF |
|---|---|
| | OFF. MADSEN #1166 |

On 07/26/2007, at 1148 hours I assisted 4T1E, Officer Madsen, #1166, on a felony traffic stop at 25 Taylor Street. We had information that the driver of the vehicle, a white Ford Taurus station wagon with tinted windows, later identified as Northcutt, Michael, was cruising the area and was armed with a handgun. After Northcutt was taken out of the vehicle and placed in handcuffs, I observed a black semi-automatic handgun under the front passenger seat. Northcutt asked, "Why am I under arrest?" I stated that we saw the gun in the car. Northcutt spontaneously stated, "Oh yeah. Well, that's all I got!"

I DECLARE, UNDER PENALTY OF PERJURY, THIS STATEMENT OF ___1___ PAGES IS TRUE AND CORRECT, BASED ON MY PERSONAL KNOWLEDGE.

SIGNATURE OF PERSON GIVING STATEMENT _____

**SFPD Written Statement**  Case#070754986

On the above date at approximately 1045 hours I was contacted by a Confidential Reliable Informant, hereafter referred to as CRI, who stated that they observed a black male in possession of a firearm while he was driving in the 6th/Market St area. The CRI further added that this vehicle, which the black male was the driver and sole occupant, was a white Ford Taurus with a partial plate with the ending letter/numbers of R301. The CRI informed me that they observed the vehicle driving northbound on Taylor St toward Turk St within the past several minutes. Lastly, the CRI described the firearm as being similar to a "Desert Eagle."

After I spoke with the CRI, I now relayed the CRI's aforementioned information to Ofc Wong, Ofc Michaud and Lt Hoffman who are all assigned to the Tenderloin Station.

#394